23-30711

IN THE

# United States Court of Appeals

## FOR THE FIFTH CIRCUIT

———◆◆———

BILAL HANKINS,

*Plaintiff-Appellant,*

—v.—

KEVIN WHEELER, in his individual and official capacity; RAMON PIERRE, in his individual and official capacity; CARL PERILLOUX, in his individual and official capacity; ORLEANS LEVEE DISTRICT POLICE; HOUSING AUTHORITY OF NEW ORLEANS; HURTSVILLE SECURITY AND NEIGHBORHOOD IMPROVEMENT DISTRICT; DOE INSURANCE COMPANIES 1–10; KERRY NAJOLIA; SOUTHEAST LOUISIANA FLOOD PROTECTION AUTHORITY – EAST; MICHAEL BRENCKLE; DARNELL LAURENT; THADDEUS PETIT; JAMEL BROWN; TYRONE MARTIN; DEMETRUIS JACKSON; TOMMY MERCADAL; LEONTINE MULLINS,

*Defendants–Appellees.*

—————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

## BRIEF FOR PLAINTIFF-APPELLANT

NORA AHMED
BRIDGET WHEELER
ACLU FOUNDATION
  OF LOUISIANA
1340 Poydras Street,
  Suite 2160
New Orleans, Louisiana 70112
(504) 522-0628

PATRICK J. HAYDEN
VICTORIA R. PASCULLI
COOLEY LLP
55 Hudson Yards
New York, New York 10001
(212) 479-6000

PATRICK E. GIBBS
COOLEY LLP
3175 Hanover Street
Palo Alto, California 94304
(605) 843-5000

*Attorneys for Plaintiff-Appellant*

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court to evaluate possible disqualification or recusal.

*Plaintiff-Appellant:*
    Bilal Hankins

*Counsel for Plaintiff-Appellant:*
    Christina Jensen
    Christopher Andrews
    Erin Wheeler
    Nora Ahmed
    Patrick E. Gibbs
    Patrick J. Hayden
    Victoria R. Pasculli
    ACLU of Louisiana
    Cooley LLP

*Defendants-Appellees:*
    Kevin Wheeler
    Ramon Pierre
    Carl Perilloux
    Orleans Levee District Police
    Housing Authority of New Orleans
    Hurstville Security and Neighborhood Improvement District
    Kerry Najolia
    Southeast Louisiana Flood Protection Authority-East
    Michael Brenckle
    Darnell Laurent
    Thadderus Petit
    Jamel Brown
    Tyrone Martin
    Demetrius Jackson
    Tommy Mercadal
    Leontine Mullins

*Counsel for Defendants-Appellees:*
    Mark Hanna
    John Zazulak
    Trevor Cutaier
    Rachel Wisdom
    Evan P. Lestelle
    Heather Lonian
    Maggie A. Broussard
    Mouledoux Bland Legrand &
    Brackett LLC
    Stone, Pigman, Walther,
    Wittman, LLC


*/s/ Patrick J. Hayden*
Patrick J. Hayden
Cooley LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000
phayden@cooley.com

*Counsel for Plaintiff-Appellant*

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34 and Fifth Circuit Rule 28.2.3, Plaintiff-Appellant respectfully requests oral argument. This case presents novel questions regarding the historical foundation and original text of 42 U.S.C. § 1983, the viability of modern qualified immunity doctrine, and the application of that doctrine, if at all, to a uniquely troubling fact pattern, involving police officers who stopped and pointed firearms at young people who had simply requested their help looking for a dog. Plaintiff-Appellant respectfully submits that oral argument will assist this Court in reviewing the record and deciding the questions presented.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................. 1

JURISDICTIONAL STATEMENT ................................................ 6

STATEMENT OF THE ISSUES .................................................. 6

STATEMENT OF THE CASE ....................................................... 7

    A.   Factual Background ................................................... 7

    B.   Procedural Background ........................................... 9

SUMMARY OF THE ARGUMENT ......................................... 12

STANDARD OF REVIEW ......................................................... 16

ARGUMENT ................................................................................. 17

I.   The Doctrine of Qualified Immunity Violates the Original Text of
Section 1983 and Should Not Restrict Discovery .......................... 17

    A.   The Original Text of Section 1983 Abrogates Common-Law
Defenses and Immunities ...................................... 17

    B.   The Removal of the Notwithstanding Clause in the Revised
Statutes of 1874 Did Not Change the Substance of the Law
.......................................................................... 23

    C.   The Doctrine of Qualified Immunity Improperly Limited
Hankins's Scope of Discovery ................................ 27

II.   The District Court Erred in Granting Summary Judgment
Because a Reasonable Jury Could Conclude that Wheeler and
Pierre Unreasonably Seized Hankins ........................... 29

    A.   The Fourth Amendment Prohibits Warrantless Stops Absent
Reasonable Suspicion of Criminal Activity.......................... 30

    B.   Hankins Met His Summary Judgment Burden by

# TABLE OF CONTENTS
(continued)

**Page**

Demonstrating Genuine Issues of Material Fact as to Whether the Officers Had Reasonable Suspicion ................ 31

C.    The Officers Violated Clearly Established Fourth Amendment Law ................................................... 44

III.   The District Court Erred in Granting Summary Judgment Because a Reasonable Jury Could Conclude that Wheeler and Pierre Used Excessive Force ........................................... 49

A.    The Fourth Amendment Guarantees the Right to Be Free From Excessive Force ............................................ 50

B.    Hankins Met His Summary Judgment Burden of Demonstrating Disputes of Material Fact Regarding the Officers' Use of Force ........................................... 51

C.    The Officers' Use of Excessive Force Violated Clearly Established Law ................................................ 57

IV.   The District Court's Dismissal of Hankins's Constitutional Conspiracy, Supervisory Liability, and *Monell* Claims Must Be Reversed ..................................................... 60

V.    The District Court's Refusal to Exercise Supplemental Jurisdiction Over Hankins's State Law Claims Warrants Reversal ....................................................... 61

CONCLUSION ............................................................ 61

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alexander v. City of Round Rock,*
854 F.3d 298 (5th Cir. 2017)..................................... 41, 46, 47

*Astoria Fed. Sav. & Loan Ass'n v. Solimino,*
501 U.S. 104 (1991) ............................................................. 18

*Baird v. Renbarger,*
576 F.3d 340 (7th Cir. 2009)............................................... 55

*Bostock v. Clayton Cnty.,*
140 S. Ct. 1731 (2020) ........................................................ 20

*Briscoe v. Lahue,*
460 U.S. 325 (1983) ............................................................. 19

*Brown v. Davenport,*
596 U.S. 118 (2022) ............................................................. 23

*Brown v. Lewis,*
779 F.3d 401 (6th Cir. 2015)............................................... 37

*Brown v. Texas,*
443 U.S. 47 (1979) .................................................. 43, 44, 45

*Buckley v. Fitzsimmons,*
509 U.S. 259 (1993) ............................................................. 19

*Carswell v. Camp,*
37 F.4th 1062 (5th Cir. 2022) ............................................. 11

*Carswell v. Camp,*
54 F.4th 307 (5th Cir. 2022) ............................................ 6, 28

*Darden v. City of Fort Worth,*
880 F.3d 722 (5th Cir. 2018)............................................... 50

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Davis v. Bergeon,*
  187 F.3d 635, 1999 WL 591448 (6th Cir. 1999) .................................. 52

*Deville v. Marcantel,*
  567 F.3d 156 (5th Cir. 2009) .............................................................. 16

*Joseph ex rel. Est. of Joseph v. Bartlett,*
  981 F.3d 319 (5th Cir. 2020) ......................................................... 52, 54

*Flores v. City of Palacios,*
  381 F.3d 391 (5th Cir. 2004) ............................................................ 54,

*Flores v. Rivas,*
  2020 WL 563799 (W.D. Tex. Jan. 31, 2020) .................................. 58, 59

*Fourco Glass Co. v. Transmirra Prod. Corp.,*
  353 U.S. 222 (1957) ........................................................................... 24

*Gonzalez v. Huerta,*
  826 F.3d 854 (5th Cir. 2016) ...................................... 16, 17, 45, 46, 47

*Goodson v. City of Corpus Christi,*
  202 F.3d 730 (5th Cir. 2000) ............................................................. 30

*Graham v. Connor,*
  490 U.S. 386 (1989) ........................................................................... 50

*Hague v. Comm. for Indus. Org.,*
  307 U.S. 496 (1939) ........................................................................... 24

*Harlow v. Fitzgerald,*
  457 U.S. 800 (1982) ...................................................................... 18, 19

*Illinois v. Wardlow,*
  528 U.S. 119 (2000) ........................................................................... 31

*Imbler v. Pachtman,*
  424 U.S. 409 (1976) ........................................................................... 19

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Johnson v. Arteaga-Martinez,*
  596 U.S. 573 (2022) ........................................................................ 23

*Jones v. Alfred H. Mayer Co.,*
  392 U.S. 409 (1968) ........................................................................ 26

*Kinney v. Weaver,*
  367 F.3d 337 (5th Cir. 2004) ......................................................... 44

*Kisela v. Hughes,*
  138 S. Ct. 1148 (2018) .................................................................... 19

*Manis v. Cohen,*
  2001 WL 1524434 (N.D. Tex. Nov. 28, 2001) ........................ 58, 59

*Manis v. Lawson,*
  585 F.3d 839 (5th Cir. 2009) ......................................................... 44

*McClendon v. City of Columbia,*
  305 F.3d 314 (5th Cir. 2002) ......................................................... 48

*McCoy v. Alamu,*
  141 S. Ct. 1364 (2021) .................................................................... 58

*Miller v. Salvaggio,*
  2021 WL 3474006 (W.D. Tex. Aug. 6, 2021) ................................ 59

*Newman v. Guedry,*
  703 F.3d 757 (5th Cir. 2012) ......................................................... 54

*NLRB v. SW Gen., Inc.,*
  580 U.S. 288 (2017) ........................................................................ 21

*Norfolk Redevelopment & Hous. Auth. v. Chesapeake &*
  *Potomac Tel. Co.,*
  464 U.S. 30 (1983) .......................................................................... 18

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*OBB Personenverkehr AG v. Sachs,*
    577 U.S. 27 (2015) ................................................................ 23

*Perron v. Travis,*
    2023 WL 6368131 (M.D. La. Sept. 28, 2023) ...................................... 23

*Pierson v. Ray,*
    386 U.S. 547 (1967) ................................................................ 18

*Price v. Montgomery Cnty.,*
    72 F.4th 711 (6th Cir. 2023) ...................................................... 22

*Procunier v. Navarette,*
    434 U.S. 555 (1978) ................................................................ 19

*Ramirez v. Martinez,*
    716 F.3d 369 (5th Cir. 2013) ...................................................... 54

*Reitz v. Woods,*
    85 F.4th 780 (5th Cir. 2023) ...................................................... 16

*Rogers v. Jarrett,*
    63 F.4th 971 (5th Cir. 2023) ................................................. 22, 27

*Roque v. Harvel,*
    993 F.3d 325 (5th Cir. 2021) ...................................................... 50

*Sam v. Richard,*
    887 F.3d 710 (5th Cir. 2018) ................................................. 50, 57

*Stafford v. Manley,*
    2019 WL 2648449 (W.D. Tex. June 27, 2019) ........................................ 34

*Stamps v. Town of Framingham,*
    813 F.3d 27 (1st Cir. 2016) ....................................................... 55

*Strother v. Lucas,*
    37 U.S. 410 (1838) ................................................................ 20

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Tarver v. City of Edna,*
410 F.3d 745 (5th Cir. 2005) ................................................................ 35

*Taylor v. Rijoas,*
592 U.S. 7 (2020) ................................................................ 44, 57

*Tennessee v. Garner,*
471 U.S. 1 (1985) ................................................................ 31

*Thomas v. Pohlmann,*
681 F. App'x 401 (5th Cir. 2017) ................................................................ 60

*Timpa v. Dillard,*
20 F.4th 1020 (5th Cir. 2021) ................................................................ 29

*United States v. Black,*
707 F.3d 531 (4th Cir. 2013) ................................................................ 33, 34

*United States v. Hill,*
752 F.3d 1029 (5th Cir. 2014) ................................................................ *passim*

*United States v. Jaquez,*
421 F.3d 338 (5th Cir. 2005) ................................................................ 41

*United States v. McKinney,*
980 F.3d 485 (5th Cir. 2020) ................................................................ 40

*United States v. Michelletti,*
13 F.3d 838 (5th Cir. 1994) ................................................................ 38

*United States v. Moreno-Chaparro,*
180 F.3d 629 (5th Cir. 1998) ................................................................ 34

*United States v. Price,*
383 U.S. 787 (1966) ................................................................ 26

*United States v. Texas,*
507 U.S. 529 (1993) ................................................................ 17

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Welden,*
    377 U.S. 95 (1964)................................................................24

*United States v. Williams,*
    808 F.3d 238 (4th Cir. 2015).........................................4, 42

*W. Union Tel. Co. v. Call Pub. Co.,*
    181 U.S. 92 (1901)................................................................21

*Watt v. Alaska,*
    451 U.S. 259 (1981)..............................................................25

*Wheaton v. Peters,*
    33 U.S. (8 Pet.) 591 (1834).................................................21

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989)................................................................19

*Wilson v. Lamp,*
    901 F.3d 981 (8th Cir. 2018)...............................................52

*Winzer v. Kaufman Cnty.,*
    916 F.3d 464 (5th Cir. 2019).......................................17, 31

*Zadeh v. Robinson,*
    928 F.3d 457 (5th Cir. 2019)...............................................28

*Ziglar v. Abbasi,*
    582 U.S. 120 (2017).......................................................19, 28

**Statutes**

28 U.S.C. § 1291....................................................................6

28 U.S.C. § 1331....................................................................6

28 U.S.C. § 1343(a)(3)..........................................................6

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

28 U.S.C. § 1367................................................................ 6

42 U.S.C. § 1983........................................................ *passim*

Ku Klux Klan Act of 1871 ....................................... 13, 20, 23

## Legislative Materials

2 Cong. Rec. 129 (1873) ............................................ 25

2 Cong. Rec. 646 (1874) ............................................ 24

2 Cong. Rec. 4220 (1874) .......................................... 24

## Other Authorities

Matthew Ackerman, *Reflections on a Qualified (Immunity) Circuit Split*, Ackerman & Ackerman (March 17, 2022), http://tinyurl.com/36xjxvw7................................................28

*A New Dictionary of the English Language* (1837) ................................21

William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45 (2018) ...........................................19

Brief of the Cato Institute as Amicus Curiae in Support of Petitioner, *Rogers v. Jarrett*, No. 20-93 (U.S. Aug. 31, 2023) ..................................................19

*Complete Dictionary of the English Language* (Webster's 1886) ...................................................21

*Etymological Dictionary of the English Language* (Chambers's 1874)...............................................21

Bryan A. Garner, *Garner's Modern English Usage* (4th ed. 2016) ..................................................21

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

Richard A. Matasar, *Personal Immunities Under Section 1983: The Limits of the Court's Historical Analysis*, 40 Ark. L. Rev. 741 (1987) ........................................................ 22

Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 L. Library J. 213 (2020) ............................................. 23

Alexander Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201 (2023) ................................. *passim*

Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797 (2018) .................................... 19

## <u>INTRODUCTION</u>

On June 13, 2020, Plaintiff-Appellant Bilal Hankins and two friends stopped playing video games at his home to help search for a lost dog. As the youths were driving through a neighborhood near Hankins's home, Hankins spotted a police officer—Defendant-Appellee Kevin Wheeler—in a marked police car. Rather than flee or evade the officer, they pulled up beside his vehicle, and Hankins asked for help finding the lost dog, gave his home address, and requested that Wheeler reach out should he find the lost dog. Wheeler did not help. Instead, he radioed Defendant-Appellee Ramon Pierre, and the two proceeded to trail the youths, pull them over with flashing lights, and point their firearms at Hankins and the others, only letting them go after Hankins again told the officers what they knew all along—that he was looking for a lost dog.

Viewing the facts in the light most favorable to Hankins, a reasonable jury could easily conclude that the officers violated Hankins's Fourth Amendment rights to be free from unreasonable seizures and excessive force, as Hankins claims in this suit brought under 42 U.S.C. § 1983. As to the traffic stop, the officers simply had no reasonable basis to suspect that Hankins was engaging in any crime: Hankins had

affirmatively told the officers what he was doing—searching for a dog—and the officers were aware of no criminal activity at the time they stopped the youths.  As to excessive force, the officers had no reason to point their guns at Hankins:  he posed no threat, having initiated contact with the officers in the first place and having complied with their demands once stopped.  The officers' decision nonetheless to brandish their firearms was clearly unreasonable, escalating an unlawful traffic stop into a potentially deadly experience for Hankins and his young friends.

Concluding otherwise, the district court abandoned the settled standard this Court applies on summary judgment, ignoring material facts, failing to view the evidence in the light most favorable to Hankins, and making improper credibility determinations.  In particular, the district court rationalized both the officers' stop and use of force with only a handful of considerations—for example, that the stop took place in "late evening," that the car in which Hankins sat was "driving slowly," that the car's license plate was registered to a woman who lived some distance away (the woman was the mother of one of the youths), and that the officers believed the neighborhood had experienced "previous car break-

ins." ROA.3661, 3663. In the district court's view, these factors meant that the officers' stop and use of their weapons were reasonable as a matter of law.

That was error for several reasons, including because the district court failed to consider the totality of the circumstances—ignoring several material facts that defeat any claim that the officers had reasonable suspicion to stop Hankins, much less point their guns at him. For example, the district court did not grapple with the undisputed fact that Hankins had affirmatively approached officers and asked for their assistance—essentially, endorsing the absurd notion that Hankins was trying to preemptively mask his intent to burglarize cars by seeking out and soliciting a police officer's help in searching for a lost dog. Under the district court's reasoning, a youth like Hankins is *worse* off engaging with officers than ignoring or disrespecting them—an outcome courts have repeatedly rejected.

Nor did the district court address the fact that Wheeler had initially decided it was *not* necessary to stop Hankins on the basis of the same information the district court cited as sufficient cause for the stop— namely, the late hour and the vehicle's registration. Wheeler's initial

assessment was the right one, and the district court did not find that he gathered any new information that would have given him reasonable suspicion where he previously had none. Moreover, to the extent the district court simply believed the officers' accounts more than Hankins's, that was a credibility determination that had no place in a summary judgment analysis.

The limited facts the district court *did* address, meanwhile, did not justify a stop or the use of firearms. First, a car driving in "late evening" is not suspicious, ROA.3661—"there is nothing inherently suspicious about driving at night," *United States v. Williams*, 808 F.3d 238, 248 (4th Cir. 2015), and the late hour here was easily explained by the fact that the dog Hankins sought had escaped at night. Second, a car "driving slowly" is not suspicious either—the officers knew why the car was moving at such a pace; it was because the passengers were looking for a lost dog, not planning to commit crime. ROA.3661. Third, the fact that a neighborhood has "had previous car break-ins" does not justify a stop— least of all where, as here, there is no claim that officers were aware of such activity on the evening in question or had any reason to suspect Hankins of being involved. ROA.3661. And fourth, the vehicle's

registration did not create reasonable suspicion either—indeed, Wheeler had already learned the car was registered to someone else and had decided this fact did not warrant a stop.

For these reasons, the district court was wrong to find that the officers are entitled to qualified immunity in this case, but there is a more fundamental reason why the doctrine should not shield the officers from liability:  it directly contravenes the original text of Section 1983.  As scholars have recently determined and members of this Court have recognized, new research has revealed Section 1983 contained a since-omitted clause that expressly prohibited common-law immunities like those qualified immunity is meant to embody.  Setting the record straight is critical and has concrete consequences for cases like this one, where discovery has been curtailed given the limitations on liability that qualified immunity imposes.  With such grave and widely recognized doubts about the doctrine, this Court should, at a minimum, clarify that invoking a qualified immunity defense is not grounds to restrict discovery the parties would ordinarily conduct.  In a similar vein, the Court should reconsider prior precedent placing the burden of overcoming the qualified immunity defense on the plaintiff, as opposed to the defendant.

5

For these reasons, the district court's judgment should be reversed.

## JURISDICTIONAL STATEMENT

Hankins appeals from a final judgment of the district court entered on September 6, 2023, granting Defendants' motions for summary judgment on the basis of qualified immunity with respect to Hankins's claims under 42 U.S.C. § 1983, and declining to exercise supplemental jurisdiction over Hankins's state law claims. ROA.3668. The district court had jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3), and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

Hankins filed a timely notice of appeal on October 6, 2023. ROA.3669. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.    Because the qualified immunity doctrine directly contravenes the clear text of Section 1983 as originally enacted by Congress, should this Court reconsider its application of the doctrine, at a minimum by revisiting the discovery restrictions it has applied when qualified immunity is asserted, *see Carswell v. Camp*, 54 F.4th 307, 311–12 (5th Cir. 2022), *cert. denied*, 144 S. Ct. 73 (2023)—and here prevented

Hankins from obtaining fulsome discovery on officers' credibility, training, and racial biases—or this Court's jurisprudence concerning on which party the burden of the qualified immunity defense should lie?

2.    Did the district court err in granting Wheeler and Pierre summary judgment on Hankins's unreasonable seizure claim under the Fourth Amendment, where a reasonable jury could conclude that the officers lacked reasonable suspicion to stop him?

3.    Did the district court err in granting Wheeler and Pierre summary judgment on Hankins's excessive force claim under the Fourth Amendment, where a reasonable jury could conclude that the officers' use of force was objectively unreasonable?

## STATEMENT OF THE CASE

### A.    Factual Background

On the night of June 13, 2020, Hankins and two of his friends, one a college student and the other a 12-year-old, were looking for a lost dog. ROA.2667–69, 2671–72.  Hankins asked Wheeler, a uniformed police officer in a marked Orleans Levee District-Police Department police car, whether he had seen the dog.  ROA.2673–2674, 3647.  Wheeler said "No." ROA.3647.  Hankins then gave Wheeler a description of the dog and his

home address, but Wheeler did not take notes or ask follow-up questions. ROA.2674.

After Hankins and his friends left to keep searching for the dog, Wheeler did not assist them. ROA.3648. Instead, he called Pierre for backup. ROA.3648. Pierre, who works for the Housing Authority of New Orleans ("HANO") Police Department, was wearing plain clothes and driving a personal vehicle. ROA.2687, 2710, 2742. Both officers were working as private patrol officers for Hurstville. ROA.2687, 2710, 2742. Wheeler later claimed he was skeptical that Hankins was actually searching for a dog, ROA.2710, and believed that the group sought to commit a crime such as burglary, general theft, or auto theft, ROA.2680, 2710. However, neither Wheeler nor Pierre reported seeing Hankins or his friends act like suspected carjackers—*i.e.*, reaching toward or pulling car door handles—or committing any traffic violations. ROA.2746, 2751.[1] Wheeler then ran a license plate check on the car. It was registered to a New Orleans East address and was not reported stolen. ROA.2710. Still,

---

[1] As noted *infra* note 10, Pierre claimed that he observed Hankins "leaning outside the vehicle," ROA.2751, but Hankins disputed this fact, testifying that none of the occupants leaned out of the vehicle's windows, ROA.2672.

the officers followed Hankins and his friends for several blocks. ROA.2711, 3648.

Soon after, the officers flashed their lights and conducted an illegal traffic stop. *See* ROA.2711.[2] Wheeler yelled: "Driver, get the f--- out the car." ROA.2676. The officers brandished their guns at Hankins and his friends and accused them of lying about their search for the lost dog. ROA.2678. The officers dispute this fact, alleging that neither drew a weapon. ROA.3649. Once the officers realized that Hankins and his friends were telling the truth, they let the group leave. ROA.3650.

### B.   Procedural Background

On June 10, 2021, Hankins brought this action pursuant to 42 U.S.C. § 1983. ROA.29–55. Hankins asserted claims of, *inter alia*, unreasonable seizure and excessive force under the Fourth and Fourteenth Amendments. ROA.29–55. On October 5, 2021, Hankins filed an amended complaint. ROA.332–66.

Defendants HANO, Lieutenant Tyrone Martin, Sergeant Demetrius Jackson, Sergeant Tommy Mercadal, and Sergeant Leontine

---

[2] When the officers first flashed their lights, the youths initially continued to drive slowly. ROA.2715, 3648–49.

Mullins (collectively, the "HANO Defendants") and Defendant Hurstville and Wheeler, Pierre, and Carl Perilloux (collectively, the "Hurstville Defendants"), as well as the Southeast Louisiana Flood Protection Authority-East (the "SLFPA-E") and Officers Kerry Najolia, Michael Brenckle, Darnell Laurent, Thaddeus Petit, and Jamel Brown (collectively, the "SLFPA-E Defendants") filed their answers to the amended complaint on August 18 and 19, 2022. ROA.1020–85. In their answer to the amended complaint, the Hurstville Defendants and the SLFPA-E Defendants asserted as a defense to Hankins's claims that they "are entitled to and protected by the quality immunity afforded to public officials for acts committed during the course of their official duties." ROA.1021. Similarly, the HANO Defendants asserted as a defense that they "are entitled to immunity, including but not limited to qualified immunity and discretionary act immunity." ROA.1045.

Thereafter, on September 15, 2022, Defendants filed a motion to limit discovery to the issue of qualified immunity, which Hankins opposed. ROA.1106–15. On October 5, 2022, in an oral ruling, the magistrate judge granted the motion to limit discovery, ordering that "discovery shall be limited to the issue of qualified immunity until the

resolution of the qualified immunity defense issue." ROA.1468. The court's ruling was based on this Court's decision in *Carswell v. Camp*, 37 F.4th 1062 (5th Cir. 2022), *withdrawn and superseded*, 54 F.4th 307 (5th Cir. 2022), reasoning that its goal is to "try to protect the other defendants from the cost and burden of litigating when possibly they shouldn't be in the lawsuit to begin with," ROA.3742. In addition, the court stated that "the overall mandate that I am given and you are given to try to streamline the cost of discovery as a means of streamlining the cost of litigation, we need to do qualified immunity discovery first." ROA.3742.

Hankins sought review of this order before the district court. ROA.1469–97. The district court reviewed the order, and at a status conference on November 7, 2022 (ROA.1547), directed the parties to proceed with the contemplated discovery on issues solely related to qualified immunity, ROA.1598. On January 30, 2023, the district court denied Hankins's motion to review this ruling as moot "given the current stage of the parties' discovery." ROA.1613.

On March 7, 2023, the Hurstville Defendants, the SLFPA-E Defendants, and the HANO Defendants moved for summary judgment on the issue of qualified immunity. ROA.1807–2539.

On September 6, 2023, the district court entered its Order and Reasons granting the Defendants' motions for summary judgment. ROA.3646–67. The district court first determined that Wheeler and Pierre were acting within their discretionary authority when they conducted the stop at issue. ROA.3655–58. As to Hankins's Fourth Amendment claims, the district court held that the officers subjected Hankins to a reasonable seizure and that the officers' use of force was objectively reasonable. ROA.3658–65. Because the district court did not find a constitutional violation, it did not address Hankins's constitutional conspiracy, supervisory liability, and *Monell* claims on summary judgment, and declined to exercise supplemental jurisdiction over Hankins's state law claims. ROA.3665–66. On September 12, 2023, the district court entered a judgment in Defendants' favor. ROA.3668. This appeal timely followed. ROA.3669.

## SUMMARY OF THE ARGUMENT

The district court erred in granting summary judgment on qualified

immunity grounds to Wheeler and Pierre, and its order should be reversed.

**First**, as members of this Court have now recognized, recent scholarship reveals that the original text of Section 1983 is directly contrary to the modern doctrine of qualified immunity. In a clause that was later omitted, Section 1983 specified that it prohibits the deprivation of constitutional rights "any such law, statute, ordinance, regulation, custom, or usage of the State to the contrary notwithstanding." Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871). But today's qualified immunity doctrine rests on precisely such "custom" or "usage"—the doctrine's premise is that Congress intended to incorporate common law immunities. This historical evidence should result in reconsideration of the doctrine altogether, including on whom the burden should lie; at a minimum, this Court should clarify that the qualified immunity doctrine does not impose any restrictions on discovery, such as those applied in this case.

**Second**, the district court erred in granting summary judgment to the officers on Hankins's claim that the traffic stop constituted an unreasonable seizure in violation of the Fourth Amendment. Hankins

amply satisfied his burden of demonstrating genuine issues of material fact as to whether the officers had reasonable suspicion to stop him and his friends—which the district court largely ignored. The district court did not, for example, explain how the fact that Hankins undisputedly approached officers first and explained that he was searching for a lost dog could be squared with reasonable suspicion that he was engaged in criminal activity. Nor did the district court even address the fact that, shortly before the stop, Wheeler considered the same evidence later cited as the basis for conducting the stop—that it was late at night and the vehicle was registered to someone other than the driver—and determined that a stop was *not* necessary. And the undisputed facts the district court *did* identify do not add up to reasonable suspicion: the mere fact that an area has "had previous car break-ins"—absent any evidence that these break-ins were connected in any way to Hankins or to the evening in question—does not create reasonable suspicion, and the fact that the encounter occurred at a "late evening" hour offers no excuse to the warrant requirement, either. ROA.3661.

***Third***, the district court erred in granting summary judgment to the officers on Hankins's claim that their use of firearms constituted

excessive force. The record is undisputed, and a reasonable jury could conclude, that Hankins and his friends posed no threat to the officers: there was no reported crime that evening, the youths did not attempt to evade the officers, and they complied with the officers' demands upon being stopped, after initially interpreting the officers' flashing lights as a signal that the officers were passing by. Indeed, the vehicle's occupants had affirmatively approached Wheeler moments earlier and explained what they were doing. At bottom, viewing the facts in the light most favorable to Hankins, pointing guns at an individual who moments before had asked for assistance in searching for a lost dog is objectively unreasonable under clearly established law.

*Finally*, the district court erred in granting summary judgment on Hankins's claims for conspiracy, supervisory liability, and municipal liability and in declining to exercise supplemental jurisdiction over his state law claims. The sole basis for making these determinations was its conclusion that the officers were entitled to summary judgment on Hankins's Fourth Amendment claims. Because that conclusion was incorrect, the district court's ruling as to these remaining claims cannot stand.

The district court's order should be reversed.[3]

## STANDARD OF REVIEW

"This court reviews a grant of a motion for summary judgment *de novo*, and applies the same standard as the district court, viewing the evidence in the light most favorable to the nonmovant." *Reitz v. Woods*, 85 F.4th 780, 787 (5th Cir. 2023) (citation omitted). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). "In reviewing the evidence, the court must refrain from making credibility determinations or weighing the evidence." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (quotations omitted).

This Court "also review[s] a grant of qualified immunity de novo." *Gonzalez v. Huerta*, 826 F.3d 854, 856 (5th Cir. 2016) (citation omitted). "A public official is entitled to qualified immunity unless the plaintiff demonstrates that (1) the defendant violated the plaintiff's constitutional rights and (2) the defendant's actions were objectively unreasonable in

---

[3] For purposes of this appeal, Hankins does not dispute that Wheeler and Pierre acted within the scope of their discretionary authority at the time of the stop. *See* ROA.3655–58.

16

light of clearly established law at the time of the violation." *Id.* (citation omitted).    In granting qualified immunity on summary judgment, a district court commits reversible error if it "ignore[s] facts in the record," including those that "cast[] doubt" on the reasonableness of officers' actions. *Winzer v. Kaufman Cnty.*, 916 F.3d 464, 475 (5th Cir. 2019).

**ARGUMENT**

## I.  The Doctrine of Qualified Immunity Violates the Original Text of Section 1983 and Should Not Restrict Discovery

While the officers in this case do not satisfy the requirements for qualified immunity, there is a more fundamental reason why this Court should not affirm that immunity in this case:  it is completely inconsistent with the text of Section 1983 as originally enacted. *See* Alexander Reinert, *Qualified Immunity's Flawed Foundation*, 111 Calif. L. Rev. 201, 207–08 (2023).  Faithfully applied, Section 1983 allows no immunity for the officers' unlawful actions in this case and, at a minimum, does not permit courts to restrict discovery or place the burden of the defense on the party opposing it.

### A.  The Original Text of Section 1983 Abrogates Common-Law Defenses and Immunities

When Congress passes new legislation, it "does not write upon a clean slate." *United States v. Texas*, 507 U.S. 529, 534 (1993).  Rather, it

17

legislates against a backdrop of established "common law adjudicatory principles." *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Courts generally assume that Congress chose to retain the common law unless the text of the statute says otherwise. *Norfolk Redevelopment & Hous. Auth. v. Chesapeake & Potomac Tel. Co.*, 464 U.S. 30, 35–36 (1983). As such, it is the statutory text that decides whether common-law principles survive and apply to any particular statute.

Starting in 1967, the Supreme Court has assumed that Congress intended to retain common-law principles in actions under Section 1983. *See Pierson v. Ray*, 386 U.S. 547, 557 (1967). In *Pierson*, the Supreme Court reviewed the version of Section 1983 found in the U.S. Code, *id.* at 547 n.1, and concluded that the "legislative record gives no clear indication that Congress meant to abolish wholesale all common-law immunities," *id.* at 554. Accordingly, the Court granted defendants a "defense of good faith and probable cause" that existed in Mississippi's common law. *Id.* at 557.

The presumption that Congress intended to incorporate common-law defenses in Section 1983 is the foundation of the modern doctrine of qualified immunity. *See Harlow v. Fitzgerald*, 457 U.S. 800, 806–07

(1982).[4]   With each step along the path of qualified immunity, the Supreme Court has explicitly relied on the supposed silence of Section 1983 to ground the doctrine.[5]

But as it turns out, the assumption that Congress intended to incorporate the common law in Section 1983 is incorrect.  That is because the version of Section 1983 the Court looked at—the U.S. Code—*omits language originally passed by Congress.*

---

[4] More recent scholarship has cast doubt on whether there actually was any generally available defense of good faith for constitutional claims or common law torts in 1871, and several Justices have recently criticized the doctrine on these and other grounds.  *See* William Baude, *Is Qualified Immunity Unlawful?*, 106 Calif. L. Rev. 45, 55–57 (2018); Joanna C. Schwartz, *The Case Against Qualified Immunity*, 93 Notre Dame L. Rev. 1797, 1801–02 & nn.24–26 (2018); *see also, e.g., Ziglar v. Abbasi*, 582 U.S. 120, 157 (2017) (Thomas, J., concurring in part and concurring in the judgment) (noting his "growing concern with our qualified immunity jurisprudence"); *Kisela v. Hughes*, 138 S. Ct. 1148, 1162 (2018) (Sotomayor, J., dissenting) (criticizing the Court's "one-sided approach to qualified immunity [which] transforms the doctrine into an absolute shield for law enforcement"); Brief of the Cato Institute as Amicus Curiae in Support of Petitioner, *Rogers v. Jarrett*, No. 20-93 (U.S. Aug. 31, 2023).

[5] *See, e.g., Buckley v. Fitzsimmons*, 509 U.S. 259, 268 (1993) (holding that "[c]ertain immunities were so well established in 1871" that "Congress would have specifically . . . provided had it wished to abolish them"); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 67 (1989) (relying on the presumption that the 42nd Congress "likely intended" for the common law to apply); *Briscoe v. Lahue*, 460 U.S. 325, 337 (1983) (similar); *Procunier v. Navarette*, 434 U.S. 555, 561 (1978) (similar); *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) (similar).

To see how, one must turn to the origin of Section 1983. The 42nd Congress passed Section 1983 as part of the Ku Klux Klan Act of 1871. The original text of Section 1983 stated:

> [A]ny person who, under color of any law, statute, ordinance, regulation, custom, or usage of any State, shall subject, or cause to be subjected any person within the jurisdiction of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution of the United States, shall, ***any such law, statute, ordinance, regulation, custom or usage of the State to the contrary notwithstanding***, be liable to the party injured in any action at law, suit in equity, or other proper proceeding for redress . . . .

Ku Klux Klan Act of 1871, ch. 22, § 1, 17 Stat. 13 (1871) (emphasis added). The bolded text above is known as the "Notwithstanding Clause."[6]

To determine the meaning of this language, courts look to the "ordinary public meaning" "at the time of its enactment." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). As understood by the 42nd Congress, a "usage or custom" was the common law itself. *Strother v. Lucas*, 37 U.S. 410, 436–37 (1838). Whether a rule was established by "usage" or through "custom," it existed by "a common right, which means

---

[6] That language can be seen highlighted in an authentic copy of the Civil Rights Act of 1871, certified by the National Archives and Records Administration on August 19, 2022 and attached as Appendix A.

a right by common law." *Id.* at 437; *see also, e.g.*, *Wheaton v. Peters*, 33 U.S. (8 Pet.) 591, 659 (1834) (similar); *W. Union Tel. Co. v. Call Pub. Co.*, 181 U.S. 92, 102 (1901) (citing Black's Law Dictionary for proposition that common law springs from "usages and customs").

Against this backdrop, the term "notwithstanding" has the same ordinary public meaning today as it did for the 42nd Congress in 1871. *See* Bryan A. Garner, *Garner's Modern English Usage* 635 (4th ed. 2016) ("This usage [of notwithstanding] has been constant from the 1300s to the present day."). "Notwithstanding" means "[w]ithout opposition, prevention, or obstruction from," or "in spite of." *Complete Dictionary of the English Language* 894 (Webster's 1886); *NLRB v. SW Gen., Inc.*, 580 U.S. 288, 301 (2017) (explaining that the ordinary meaning of "notwithstanding" is "in spite of" or "without prevention or obstruction from or by"). Many then-contemporaneous dictionaries confirm this meaning. *See, e.g.*, *Etymological Dictionary of the English Language* 344 (Chambers's 1874) ("not standing against or opposing; nevertheless."); 2 *A New Dictionary of the English Language* 1351 (1837) ("[n]ot opposing, resisting, hindering, preventing.").

This plain-English understanding of the Notwithstanding Clause is

consistent with the context and history of its enactment. *See* Reinert, *supra*, at 238–39. And, to the extent relevant, records of legislative debates of the Civil Rights Act of 1871 are "far from . . . silent about immunities"—rather, they are "replete" with evidence that the provision would displace common-law immunities. Richard A. Matasar, *Personal Immunities Under Section 1983: The Limits of the Court's Historical Analysis*, 40 Ark. L. Rev. 741, 771 (1987).

As members of this Court have now recognized, the Notwithstanding Clause thus means that the common law cannot prevent persons from being held liable under Section 1983. *See* Reinert, *supra*, at 236. As Judge Willett recently explained: "The language is unsubtle and categorical, seemingly erasing any need for unwritten, gap-filling implications, importations, or incorporations. Rights-violating state actors are liable—period—notwithstanding any state law to the contrary." *Rogers v. Jarrett*, 63 F.4th 971, 980 (5th Cir. 2023) (Willet, J., concurring), *cert. denied*, 144 S. Ct. 193 (2023)[7]; *see also Price v.*

---

[7] While the Supreme Court denied certiorari in *Rogers*, the parties there had not raised any argument regarding the Notwithstanding Clause— nor any challenge to the doctrine of qualified immunity more generally— prior to seeking review. *See* Appellant's Brief, *Rogers v. Jarrett*, 63 F.4th

*Montgomery Cnty.*, 72 F.4th 711, 727 n.1 (6th Cir. 2023) (same); *Perron v. Travis*, 2023 WL 6368131, at *5 n.7 (M.D. La. Sept. 28, 2023) (similar). No one—neither court nor commentator—has contended otherwise.

In short, the Notwithstanding Clause means that the common law does not prevent persons from being held liable under Section 1983. *See* Reinert, *supra*, at 236 ("Its implications are unambiguous: state law immunity doctrine, however framed, has no place in Section 1983.").

## B.    The Removal of the Notwithstanding Clause in the Revised Statutes of 1874 Did Not Change the Substance of the Law

Shortly after passing the Ku Klux Klan Act of 1871, the 43rd Congress compiled the Revised Statutes of 1874. The purpose of this exercise was to "revise, simplify, arrange, and consolidate all statutes of the United States." Shawn G. Nevers & Julie Graves Krishnaswami, *The Shadow Code: Statutory Notes in the United States Code*, 112 L. Library

---

971 (5th Cir. 2023) (No. 21-20200), Dkt. No. 29-1. The Supreme Court is "a court of review, not of first view," *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 583 (2022) (citation omitted), and "[a]bsent unusual circumstances . . . [the Court] will not entertain arguments not made below," *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27, 38 (2015). The Court's denial of certiorari in *Rogers* is consistent with this practice, and in any event, "[t]he denial of a writ of certiorari in th[e] Court imports no expression of opinion upon the merits of the case. *Brown v. Davenport*, 596 U.S. 118, 142 (2022) (quotations omitted).

J. 213, 218 (2020). In other words, at its core, this compilation was organizational in design—simply putting all existing federal laws in the same place for the first time.

But Congress was not satisfied with the results of this compilation and engaged a lawyer to review the proposed revisions. This person was tasked with striking out any provision that substantively changed the law, but keeping "mere changes of phraseology not affecting the meaning of the law." 2 Cong. Rec. 646, 648 (1874).

As this Court explained, where a statutory change "was made by a codifier without the approval of Congress, it should be given no weight." *United States v. Welden*, 377 U.S. 95, 98 n.4 (1964); *see also Fourco Glass Co. v. Transmirra Prod. Corp.*, 353 U.S. 222, 227 (1957) (Reviser's changes "do not express any substantive change").

Through this exercise, Congress intended to "consolidat[e] the laws," not change their meaning. *Welden*, 377 U.S. at 98 n.4; *see also Fourco*, 353 U.S. at 227; *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 510 (1939) (similar). Indeed, Congress sought "to preserve absolute identity of meaning" in the law. 2 Cong. Rec. 4220 (1874) (Sen. Conkling). This was true for omissions, too, which the 43rd Congress viewed as a

necessary tool "to strike out the obsolete parts and to condense and consolidate." 2 Cong. Rec. 129 (1873).

These revisions were passed by the 43rd Congress as the Revised Statutes in 1874, which later became the U.S. Code. But because the explicit intent of Congress was to not change the substantive provisions of the law, the omission of the Notwithstanding Clause in 1874 did not alter the 42nd Congress's original decision to abrogate the common law from Section 1983.

This approach matches the Court's presumption against implicit statutory changes or repeals. When Congress wants to repeal or change some part of a statute, it must do so with "clear and manifest" intent. *Watt v. Alaska*, 451 U.S. 259, 266–67 (1981) (citation omitted). In other words, to incorporate the common law back into Section 1983, the Revised Statutes would have needed to include some form of positive text about the common law. *See* Reinert, *supra*, at 236–37.

But that addition to the text did not occur. The Revised Statutes did not mention the common law. And the 43rd Congress did not affirmatively include language indicating that it was reversing the 42nd Congress's decision to excise the common law from Section 1983. The

omission of the Notwithstanding Clause was intended to be a ***non-substantive*** change to the law.

It makes sense, then, that the Supreme Court has already viewed the omission of other Notwithstanding Clauses from other civil rights statutes as non-substantive changes to the law. *See Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 422 (1968); *United States v. Price*, 383 U.S. 787, 803 (1966); *The Civil Rights Cases*, 109 U.S. 3, 16–17 (1883). In *Jones*, for example, the Supreme Court viewed the omission of another Notwithstanding Clause—in Section 1982—as a non-substantive change. *Jones*, 392 U.S. at 422 n.29. The Court recognized that the Section 1982 Notwithstanding Clause was "obviously inserted" to "emphasiz[e] the supremacy of the 1866 statute over inconsistent state or local laws." *Id*. And later, when "[i]t was deleted" in the Revised Statutes, the Court presumed the omission was just a decision to remove perceived "surplusage." *Id*.

So too with Section 1983. The 1871 Congress was explicit in legislating that persons can be held liable for Section 1983 violations in spite of any common law doctrines to the contrary.

The doctrine of qualified immunity rests on the presumption that

the 1871 statute was silent about the common law. This is a fallacy. The statute was not silent—rather, it explicitly rejected any common law defenses.

## C. The Doctrine of Qualified Immunity Improperly Limited Hankins's Scope of Discovery

By challenging at the lower court the limitations qualified immunity placed on his discovery in this case—and facially challenging the doctrine in his opposition to Defendants' motion for summary judgment—Hankins preserved his qualified immunity challenge for this Court's review. As Judge Willett explained, Professor Reinert's research unearths an issue with which the federal courts must contend. Qualified immunity "does not merely complement the text [of Section 1983]—it brazenly contradicts it," which is especially important "in this text-centric judicial era when jurists profess unswerving fidelity to the words Congress chose." *Rogers*, 63 F.4th at 980–81. In the end, the issue of qualified immunity does not merely affect how the "clearly established law" prong of the legal test developed to analyze the doctrine should be assessed, but also affects the scope of discovery and the question of where

the burdens of the defense must lie.[8]

This case in particular highlights how qualified immunity affects the discovery process that is otherwise very clearly outlined by the Federal Rules of Civil Procedure. In *Carswell v. Camp*, 54 F.4th 307 (5th Cir. 2022), this Court described in detail the "careful procedure" permitted when a district court authorizes narrowly tailored discovery on the issue of qualified immunity. *Id.* at 311. But that decision is inherently premised on the view that qualified immunity is available as a defense to Section 1983 claims, and it is not.

At bottom, there is a "growing, cross-ideological chorus of jurists and scholars" recognizing that the doctrine of qualified immunity has no basis in the text of Section 1983 or the common law. *Zadeh v. Robinson*, 928 F.3d 457, 480–81 (5th Cir. 2019) (Willet, J., concurring) (footnotes omitted); *see Ziglar*, 582 U.S. at 157–60 (Thomas, J., concurring) (courts applying the doctrine are not "engaged in 'interpret[ing] the intent of Congress in enacting'" § 1983 and further "the sort of 'freewheeling policy choice[s]'" that is antithetical to the judicial role). As Professor Reinert's

---

[8] *See* Matthew Ackerman, *Reflections on a Qualified (Immunity) Circuit Split*, Ackerman & Ackerman (Mar. 17, 2022), http://tinyurl.com/36xjxvw7.

recent scholarship illuminates, the doctrine of qualified immunity "has no place in Section 1983" because it was adopted on the mistaken presumption that a relevant statute was silent about the common law. *Reinert*, *supra*, at 236. If this scholarship is correct and Section 1983 precluded common law defenses, then the issue should never have impacted the original discovery in this case and should not so impede trial now. Hankins thus requests that his case be remanded, at a minimum, to permit him to complete full discovery on all of his claims, as provided by the Federal Rules of Civil Procedure.

## II.    The District Court Erred in Granting Summary Judgment Because a Reasonable Jury Could Conclude that Wheeler and Pierre Unreasonably Seized Hankins

Even assuming that qualified immunity is applicable, the district court was wrong to grant summary judgment to Wheeler and Pierre on Hankins's unreasonable seizure claim because a reasonable jury could conclude "(1) that the official[s] violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Timpa v. Dillard*, 20 F.4th 1020, 1029 (5th Cir. 2021) (quotations omitted).

Whereas the district court determined that "there is no genuine

dispute of material fact as to whether the Plaintiff was subjected to a reasonable seizure by Officers Wheeler and Pierre," ROA.3662, the record is in fact replete with such disputes and with material facts the district court improperly ignored altogether. And the limited facts the district court *did* cite—in one paragraph, *see* ROA.3661—provide no basis for a warrantless stop as a matter of law. Viewing the record in the light most favorable to Hankins, a reasonable jury could conclude that Wheeler and Pierre unreasonably stopped Hankins—with no real suspicion of criminal activity—in violation of his clearly established Fourth Amendment rights.

## A. The Fourth Amendment Prohibits Warrantless Stops Absent Reasonable Suspicion of Criminal Activity

"Warrantless searches and seizures are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Hill*, 752 F.3d 1029, 1033 (5th Cir. 2014) (quotations omitted). As relevant here, one exception to this principle is the *Terry* stop, whereby "police officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 736 (5th Cir. 2000) (citing *Terry v.*

*Ohio*, 392 U.S. 1 (1968)).  Under this exception, "if a law enforcement officer can point to specific and articulable facts that lead him to reasonably suspect that a particular person is committing, or is about to commit, a crime, the officer may briefly detain—that is, seize—the person to investigate." *Hill*, 752 F.3d at 1033 (quotations and citation omitted). "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Illinois v. Wardlow*, 528 U.S. 119, 123–24 (2000) (quotations omitted).

Critically, in evaluating a Fourth Amendment claim, "the question [i]s whether the *totality* of the circumstances justified a particular sort of search or seizure." *Tennessee v. Garner*, 471 U.S. 1, 9 (1985) (emphasis added).  It is accordingly reversible error for a district court—like the district court here—to "ignore[] facts" regarding the circumstances at issue, including facts that "cast[] doubt on whether a reasonable officer would have concluded" that the officer's actions were warranted. *Winzer*, 916 F.3d at 475.

### B.    Hankins Met His Summary Judgment Burden by Demonstrating Genuine Issues of Material Fact as to Whether the Officers Had Reasonable Suspicion

Concluding that Wheeler and Pierre had reasonable suspicion to

31

stop Hankins, the district court relied on just four facts: (i) the stop took place in the "late evening"; (ii) the car in which Hankins sat was "driving slowly"; (iii) the vehicle's license plate was registered to "a woman who lived approximately ten miles away from the location where the car was driving"; and (iv) Hankins was "in an area that had previous car break-ins." ROA.3661. As discussed below, these four facts do not add up to reasonable suspicion, and courts across the country have repeatedly rejected similar justifications for warrantless stops. To conclude otherwise, the district court ignored material facts, failed to draw all inferences in Hankins's favor, and improperly made credibility determinations in Defendants' favor. These errors require reversal.

### 1. The District Court Failed to Seriously Consider that Hankins Affirmatively Approached Officers to Seek Assistance

There is no dispute Hankins and his friends approached Wheeler by driving towards his vehicle and requesting assistance in finding a lost dog. Hankins testified that before the stop, he approached Wheeler to ask for help finding the dog and voluntarily provided his home address

to Wheeler.  ROA.2674.[9]  These actions—disclosing what Hankins was doing, offering his home address, and volunteering to continue engaging with an officer—are entirely inconsistent with a plan to imminently commit a crime, like burglary.  ROA.2710.

That fact is plainly material, and courts have repeatedly rejected the argument that reasonable suspicion arises when a party affirmatively approaches officers and volunteers information, just as Hankins did here.  In *United States v. Black*, 707 F.3d 531 (4th Cir. 2013), for instance, the Fourth Circuit rejected the argument that officers had reasonable suspicion to stop a man who had voluntarily offered an identification card to officers—affirmative conduct the officers deemed "unusual."  *Id.* at 535 (reviewing motion to suppress).  The Fourth Circuit explained why finding reasonable suspicion in light of such conduct is "counterintuitive":

> [W]e have noted that this type of argument—that cooperation is a justification for reasonable suspicion—actually places a defendant in a worse position than if he had simply refused to cooperate altogether because the Supreme Court has consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification

---

[9] Wheeler disputed that Hankins provided his home address.  Wheeler later claimed that Hankins's conduct "seemed like a ruse to disguise that these kids may have been up to no good."  ROA.2857.

needed for a detention or seizure. . . .  In certain communities that have been subject to overbearing or harassing police conduct, cautious parents may counsel their children to be respective, compliant, and accommodating to police officers, to do everything officers instruct them to do.  If police officers can justify unreasonable seizures on a citizen's acquiescence, individuals would have no Fourth Amendment protections unless they interact with officers with the perfect amount of graceful disdain.

*Id.* at 541 (quotations and citations omitted); *see also, e.g.*, *United States v. Moreno-Chaparro*, 180 F.3d 629, 632 (5th Cir. 1998) ("We are persuaded that in the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight.").

Likewise here, the fact that Hankins—a young Black man who is undeniably a member of a community accustomed to an overbearing police presence—identified himself, told officers what he was doing, and solicited their assistance all should have defeated any suggestion that a reasonable officer would have reason to suspect he was committing a crime.  *See, e.g.*, *Black*, 707 F.3d at 541; *Stafford v. Manley*, 2019 WL 2648449, at *4–5 (W.D. Tex. June 27, 2019)  (explaining that "[s]tanding alone, it is unreasonable for an officer to suspect that an individual is committing or about to commit a crime merely because the individual

Case: 23-30711    Document: 42    Page: 49    Date Filed: 12/27/2023

makes eye contact with the officer," where plaintiff "pulled up next to a police officer at an intersection at 3:00 a.m.").

But the district court never seriously grappled with this fact, with which ultimately a jury must contend; instead, the district court responded with a terse acknowledgment that a stop might be a "disconcerting experience" for those who are "following the law." ROA.3661. To the extent the district court simply believed this fact was immaterial, that was plainly error—as discussed above, courts routinely consider such conduct in evaluating the reasonableness of a stop. *Supra* pp. 33–35. Ultimately, the district court's failure to consider this conduct infected its analysis of the *other* facts it did cite as grounds for reasonable suspicion. For example, the district court pointed to the fact that the car in which Hankins sat was "driving slowly"—but that ignores the obvious reason for the car's slow speed. ROA.3661. Under Hankins's version of the events, Wheeler already *knew* exactly why Hankins was driving slowly, and it was to find a lost dog, not to commit crime. To the extent the district court simply credited the officers' account that they "did not believe" Hankins was looking for help finding a dog, ROA.3661, that was a credibility determination that the district court had no business

making on summary judgment, *see Tarver v. City of Edna*, 410 F.3d 745, 753 (5th Cir. 2005) ("Any credibility determination made between the officers' and [plaintiff's] version of events is inappropriate for summary judgment.").

The district court's failure to consider Hankins's affirmative attempt to cooperate with officers was legal error, and the upshot of the error is troubling:  youths (or at least those like Hankins) should *not*, under the district court's decision, seek help from police officers if they wish to protect their constitutional rights.  That is not the law and should not be sanctioned here.

### 2.     The District Court Ignored That Wheeler Had Already Determined a Stop Was Not Necessary

The district court also ignored that Wheeler had initially concluded that a stop was *not* necessary after encountering Hankins and his friends—even after he ran a computer search on the license plate and determined that the car was registered to an address in New Orleans East.  *See* ROA.2713.  In particular, the district court concluded that "the address of the car's registered owner and the late hour of the night" gave the officers "reasonable suspicion that criminal activity might be occurring."  ROA.3661.  But that ignores that Wheeler had already

determined that these same two facts were *not* cause for a stop. Indeed, before his conversation with Pierre, Wheeler had precisely the same information the district court identified—*i.e.*, that it was late and that the car was registered to a woman in the vicinity—and decided that a stop was not necessary. *See* ROA.2713.

That Wheeler initially concluded that a stop was not necessary after encountering Hankins and his friends is material to any determination of reasonable suspicion. Courts have recognized, for instance, that officers may not stop an individual after an initial interaction "last[s] long enough to dispel their suspicions" of any criminal activity. *Brown v. Lewis*, 779 F.3d 401, 414 (6th Cir. 2015) (holding that officers had no basis to continue detaining woman after determining that she was not the male suspect they were seeking). Likewise here, Wheeler engaged with Hankins and gathered enough facts—including about the vehicle registration—to determine that a stop was *not* justified, meaning this information could not have factored into any reasonable suspicion for why criminal activity might be occurring. Wheeler's initial conclusion made sense for any number of reasons, including because Hankins had told him what he was doing and because Wheeler's computer search had

revealed that the car had not been reported as stolen. ROA.2710. But whatever might be gleaned from the fact that it was late and the car was registered to someone else, Wheeler himself had already decided it was not enough to justify a stop.

While Wheeler's subsequent conversation with Pierre appears to have caused his change of heart, the district court never attempted to explain how Pierre developed or contributed to any reasonable suspicion. Prior to the stop, Pierre had never seen the vehicle or interacted with Hankins, and he had no information beyond what Wheeler told him. ROA.2749. Yet based on this discussion alone—before Pierre ever encountered Hankins in the vehicle—Pierre then decided that "something is not right here." ROA.2713; *see also* ROA.2715. That supposed "hunch" is not enough to constitute reasonable suspicion, *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (en banc), and the district court never attempted to connect the dots between what Wheeler knew (and found insufficient) and what nonetheless prompted him and Pierre to stop Hankins. If the district court's assumption was that some information *must* have been identified when Pierre and Wheeler spoke, the district court never suggested what that information

was, or how it could amount to reasonable suspicion.[10]

The district court never attempted to explain how reasonable suspicion could nonetheless develop—much less identify anything Wheeler or Pierre learned that suggested potential crime. The district court's failure to consider this evidence—and its failure to view the evidence in the light most favorable to Hankins—warrants reversal.

### 3. The District Court Erred by Relying on the Officers' Account of Unspecified Prior Break-ins in the "Area"

The district court cited the fact that the neighborhood was "an area that had previous car break-ins" as a basis for reasonable suspicion. ROA.3661. But the district court ignored that the officers had no awareness of any burglary or other crime that evening—much less one they could link to Hankins or any other passenger. Indeed, neither Wheeler nor Pierre testified that there were any potential car burglaries

---

[10] While Pierre testified that he saw the front passenger "leaning outside the vehicle as to suggest he was pulling on car door handles," ROA.2751, Hankins disputed this fact, testifying that none of the occupants leaned out of the vehicle's windows during the stop and that the vehicle's seat belt indicator did not go off—which it would have if the passengers were not wearing seat belts and were hanging out of the windows, ROA.2672. Pierre also admitted that he did not observe any of the vehicle occupants attempt to open a car door before he initiated the stop. ROA.2751.

or thefts during the night of the incident, or any indication that Hankins and the other passengers in the car met the description of any alleged suspects. ROA.2713. The district court's consideration of an officer's belief that an "area" had experienced unspecified "break-ins" at some point in the past was error. ROA.3661.

This Court has long held that "a person's 'presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.'" *United States v. McKinney*, 980 F.3d 485, 492 (5th Cir. 2020) (quoting *Wardlow*, 528 U.S. at 124). Thus, this Court has consistently rejected attempts to rely on a neighborhood's general reputation for particular crimes—absent some particularized connection to the individual in question—as a basis for a warrantless stop. *See, e.g.*, *id.* (holding that officers lacked reasonable suspicion when "patrolling the area in response to recent shootings," as those shootings "do not justify stopping anyone absent an articulable suspicion about a connection between the person and those crimes"); *Hill*, 752 F.3d at 1034 (no reasonable suspicion where officers encountered a man seated in a vehicle "at 11:00 p.m. on a Saturday night, in an apartment complex that

has a drug reputation and is in a high-crime county," where officers "had no specific reason to suspect any particular criminal activity"); *United States v. Jaquez*, 421 F.3d 338, 341–42 (5th Cir. 2005) (holding that officer lacked reasonable suspicion to stop a red vehicle 15 minutes after receiving dispatch that a red vehicle was involved in gunfire in the same area); *see also Alexander v. City of Round Rock*, 854 F.3d 298, 305 (5th Cir. 2017) (holding that plaintiff adequately alleged Fourth Amendment violation as to stop where officer "had no prior tip or information that could have led him to suspect [plaintiff] of criminal activity").

Here, the district court clearly violated this precedent with a broad reference to an "area" with "previous car break-ins," which is far too general to demonstrate reasonable suspicion. ROA.3661. Among other things, the district court's description says nothing of when those prior break-ins occurred, who was claimed to have committed them, or whether the officers had any basis to think that Hankins or his friends were involved. Without more, the upshot of the district court's ruling is that it is suspicious to be "driving slowly" anywhere in the neighborhood— while looking for a house number or a lost dog—because unspecified break-ins had occurred sometime in the past. ROA.3661. Or it is

suspicious only if one looks like Hankins and his friends. Either way, this Court's precedents reject the district court's conclusion that such break-ins were a basis for reasonable suspicion.

### 4. The District Court Erred by Concluding that Driving in the "Late Evening" Creates Reasonable Suspicion

The district court also cited the fact that "the stop took place in the late evening" as a basis for the officers' stop, ROA.3661, but the mere hour does little, if anything, to create reasonable suspicion. "[T]here is nothing inherently suspicious about driving at night." *Williams*, 808 F.3d at 247–48 (holding that officers lacked reasonable suspicion for stop of vehicle driving "on a known drug corridor" shortly after midnight, recognizing that "the number of persons using the interstate highways as drug corridors pales in comparison to the number of innocent travelers on those roads"). The district court identified nothing nefarious about driving in the evening, and in this case, the reason why Hankins and his friends were on the road was obvious—they were looking for a dog that escaped at night. And even in the officers' reference to "vehicle break-ins in the neighborhood," ROA.3660 (quotations omitted), the officers did not claim that such unspecified break-ins occurred around the hour that

Wheeler encountered Hankins and his friends. The Fourth Amendment has no evening-only exception for traffic stops, and the district court's reliance on the hour at which the youths were driving was error.

### 5. The District Court Ignored That Wheeler Told Hankins Why He Conducted the Stop

Finally, the district court failed to consider Wheeler's own statement to Hankins regarding the basis for the stop—one that strongly suggested race, not reasonable suspicion of criminal activity, was the reason. Specifically, Wheeler told Hankins that the officers conducted the stop because "you know, three young men, in a nice car, in this neighborhood." ROA.2680. This evidence is material: plainly, a defendant's stated reason for conducting a stop is relevant to whether the basis for that stop is reasonable. The district court was obligated to consider this evidence, and its decision to omit any reference to what a defendant himself identified as the reason for the stop was improper.

\*    \*    \*

The facts the district court recited could only constitute reasonable suspicion by ignoring or discounting the simple explanation Hankins undisputedly gave to Wheeler (who relayed it to Pierre): he and his friends were searching for a lost dog. Even if the record suggested "an

understandable desire to assert a police presence" (and it does not), "that purpose does not negate Fourth Amendment guarantees." *Brown v. Texas*, 443 U.S. 47, 52 (1979). Accordingly, the district court erred in holding that the officers did not violate Hankins's constitutional rights, as a matter of law, when they stopped Hankins without a warrant.

## C.  The Officers Violated Clearly Established Fourth Amendment Law

As part of its qualified immunity analysis, the district court did not reach the issue of whether this traffic stop, when viewed in the light most favorable to Hankins, "violated clearly established statutory or constitutional rights of which a reasonable person would have known." *Manis v. Lawson*, 585 F.3d 839, 845 (5th Cir. 2009). It plainly did.

For a right to be clearly established, there may be "notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc) (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)). A court may not claim "ambiguity in the caselaw" as a basis for granting qualified immunity, where the cases it identifies are "too dissimilar" from the one before it. *Taylor v. Rijoas*,

44

592 U.S. 7, 9 n.2 (2020) (per curiam).  Here, when Wheeler and Pierre

stopped Hankins in 2020, controlling authority clearly established that a

stop is not objectively reasonable simply because officers felt—based on

no  objectively  reasonable  facts—that  "[s]omething's  not  right."

ROA.2715.

In *Brown v. Texas*, 443 U.S. 47 (1979), for example, the Supreme

Court held that a police stop of a suspect was not supported by reasonable

suspicion,  where  the  suspect  merely  "looked  suspicious"  in  a

"neighborhood frequented by drug users."  *Id.* at 52.  Similar to the

justifications provided by Wheeler and Pierre, an officer in *Brown*

testified that they stopped the appellant because the situation "looked

suspicious and [the officers] had never seen that subject in that area

before."  *Id.* at 49.  In addition, the location where the appellant was

stopped had a "high incidence of drug traffic."  *Id.*  However, just like

Wheeler and Pierre, the officers "did not claim to suspect appellant of any

specific misconduct, nor did they have any reason to believe that he was

armed."  *Id.*  The Supreme Court held this insufficient to constitute

reasonable suspicion.  *Id.* at 52–53.

This Court has likewise held that no reasonable suspicion existed

under similar circumstances—years *before* Wheeler and Pierre stopped Hankins.   In *Gonzalez v. Huerta*, 826 F.3d 854 (5th Cir. 2016), for example, this Court held that an officer unconstitutionally seized the plaintiff, where the stop—in 2012, eight years before the stop at issue here—was based solely on "the bare report of a 'suspicious' vehicle in the school parking lot" and "a recent history of burglaries of motor vehicles at the same location." *Id.* at 857–58.  As this Court explained, "no real inference of criminal activity can be drawn from the totality of these facts and circumstances." *Id.*[11]

Similarly, in *Alexander v. City of Round Rock*, 854 F.3d 298 (5th Cir. 2017), this Court held that the alleged facts could not establish reasonable suspicion as a matter of law where "the most [the officer]

---

[11] The district court attempted to distinguish *Gonzalez*, *see* ROA.3660–61, but the reasons it provided are unpersuasive.  The district court stated that, unlike in *Gonzalez*, Wheeler and Pierre "were not relying only on a report of a 'suspicious' car in an area that had previous car break-ins" because "the stop took place in the late evening, and that the car in which the Plaintiff sat was driving slowly." ROA.3660.  However, that ignores key facts that Hankins had affirmatively approached Wheeler, stated that he was looking for a lost dog, and asked for the officer's help—all of which contextualize why Hankins's car was driving slowly and in the late evening.  Thus, similar to the situation faced by the offices in *Gonzalez*, "any suspicions held by [Wheeler and Pierre] should have been alleviated before [they] decided to detain" Hankins.  *Gonzalez*, 826 F.3d at 857.

could have observed was a man . . . briefly looking around a vehicle in the parking lot, turning to get into a car, noticing a police car, continuing to get into the car, and beginning to drive further into the parking lot." *Id.* at 305. Here too, the officers observed nothing more suspicious—even if, as in *Alexander*, the vehicle's passengers were aware of an officer's presence and the vehicle did not immediately stop when the officers flashed their lights.

This Court's decision in *United States v. Hill*, 752 F.3d 1029 (5th Cir. 2014), though arising in the context of a motion to suppress, is particularly instructive. There, this Court affirmed the suppression of evidence on the ground that officers had no reasonable suspicion to stop and frisk a man, where the man, "without a driver's license, at 11:00 p.m. on a Saturday night, in an apartment complex that has a drug reputation and is in a high-crime county, was sitting in the driver's seat of a car that was backed into a parking spot, and, when the police arrived, his passenger exited from the car and took a few steps away." *Id.* at 1034. That was not cause for reasonable suspicion, for there simply were no "specific and articulable facts upon which to form a reasonable suspicion that [the man] had been engaged in criminal activity." *Id.* Instead, as

47

this Court explained:

> The government attempts to put an ominous gloss on what appears almost entirely ordinary. The general picture that emerges, considering all relevant factors together, is of a man and a woman sitting in a car parked in the lot of an apartment building, on a weekend night, at the moment the police arrived. [The man] and his passenger were not offending any traffic ordinance; there was no evidence of recent crimes in the neighborhood, no reason to suspect that [the man] or his passenger were wanted by the police, and no other reason to believe that anything unusual was taking place.

*Id.* (quotations omitted).

Likewise here, the district court put an "ominous gloss" on what was, viewed in the light most favorable to Hankins, an entirely mundane scene—a young man and his friends searching for a dog (exactly as he told officers before any stop) with no disturbance to the neighborhood, no reason to think the young man was "wanted by the police," and not even a suspicion that anyone was "offending any traffic ordinance." *Id.* Under clearly established law, these circumstances simply do not permit a warrantless seizure.

These decisions, in addition to those cited *supra* § II.B, constitute "directly controlling authority" that "establish[es] the illegality of such conduct" in this case. *McClendon v. City of Columbia*, 305 F.3d 314, 328–29 (5th Cir. 2002). Viewing all the facts in Hankins's favor, a reasonable

jury could conclude that Wheeler and Pierre violated his constitutional rights by stopping him without reasonable suspicion, based solely on their hunch that "something's not right," that car burglaries had occurred in the area at some point (though not on the night in question), and given the late hour of the incident. Considering the state of clearly established federal law—which the district court declined to do—the stop lacked reasonable suspicion and thus was objectively unreasonable.

## III. The District Court Erred in Granting Summary Judgment Because a Reasonable Jury Could Conclude that Wheeler and Pierre Used Excessive Force

The district court found that "in light of the totality of the circumstances, it was reasonable for [Wheeler and Pierre] to point their guns at the car as they conducted a *Terry* stop late at night." ROA.3665. The district court held that, "even if Plaintiff's allegations [that the officers pointed their guns at him] are true," the officers "did not violate Plaintiff's constitutional rights." ROA.3665. But far from considering the "totality of the circumstances," ROA.3665, the district court ignored issues of material fact and misapprehended clearly established law. Wheeler and Pierre are not entitled to qualified immunity on Hankins's excessive force claim.

### A.    The Fourth Amendment Guarantees the Right to Be Free From Excessive Force

The Fourth Amendment prohibits the use of excessive force, and summary judgment on such an excessive force claim is inappropriate if a reasonable jury could find:  "(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable." *Sam v. Richard*, 887 F.3d 710, 713 (5th Cir. 2018) (citations omitted).  These claims "are necessarily fact-intensive" because "whether the force used is excessive or unreasonable depends on the facts and circumstances of each particular case." *Darden v. City of Fort Worth*, 880 F.3d 722, 728 (5th Cir. 2018) (cleaned up).  Accordingly, courts considering such claims on summary judgment may not ignore material facts and must instead "examine the totality of the circumstances to determine whether an officer's actions were objectively unreasonable." *Roque v. Harvel*, 993 F.3d 325, 333 (5th Cir. 2021) (quotations omitted).  Pursuant to *Graham v. Connor*, 490 U.S. 386 (1989), these circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Darden*, 880 F.3d at 728 (quoting

*Graham*, 490 U.S. at 396).[12]

### B.    Hankins Met His Summary Judgment Burden of Demonstrating Disputes of Material Fact Regarding the Officers' Use of Force

The district court concluded that Wheeler and Pierre did not use excessive force as a matter of law, offering a brief discussion that largely recapped its unreasonable seizure analysis while ignoring the full context of the stop. *See* ROA.3662–65.  In particular, the district court reasoned that Wheeler and Pierre were justified in pointing guns at Hankins because of "the type of previous crime in the area, the late hour, the address of the car's registered owner, the slow-moving car with the windows open, and the driver's failure to immediately stop the vehicle when Officer Pierre activated his blue light." ROA.3663.  But the district court failed to consider the totality of the circumstances:  as discussed below, it gave no consideration, as was required, to several material facts that should have precluded summary judgment.

---

[12] The district court did not dispute that Hankins demonstrated an injury caused by the officers' use of force.  *See* ROA.3663.  Nor could it:  Hankins demonstrated that he has suffered constitutionally cognizable injuries, including nightmares, anxiety, and distress.  *See* ROA.2808–11.

**1. The District Court Ignored That Hankins Affirmatively Approached Wheeler Seeking His Assistance**

As noted, it is undisputed that Hankins and his friends affirmatively approached Wheeler, seated in his marked police car, and sought his help in finding the lost dog. *Supra* § II.B.1; ROA.2710, 2749. During this first encounter, Hankins also told Wheeler his home address and described the lost dog. ROA.2674. The district court did not grapple with this fact or explain how *any* force would have been justified when Hankins had first approached Wheeler—in a manner that no one claims was threatening—seeking his assistance. *See Joseph ex rel. Est. of Joseph v. Bartlett*, 981 F.3d 319, 324 (5th Cir. 2020) ("A disproportionate response is unreasonable. And if it describes physical force inflicted by a police officer, it is unconstitutional."); *Wilson v. Lamp*, 901 F.3d 981, 989–91 (8th Cir. 2018) (denying qualified immunity on excessive force claim against officers who continued to point weapons at driver of car and child, who were neither threatening nor resisting, after realizing neither passenger was the subject of a warrant); *Davis v. Bergeon*, 187 F.3d 635, 1999 WL 591448, at *5–6 (6th Cir. 1999) (table) (denying qualified immunity to officer who pointed firearm at plaintiff who "was not

52

suspected of any wrongdoing at that point in time").

### 2. The District Court Failed to Consider That Hankins Posed No Threat to Wheeler or Pierre

The district court also ignored the clear record that at no point did Hankins or any of his friends pose any threat to Wheeler and Pierre. Neither Wheeler nor Pierre testified that they observed Hankins and his friends committing any traffic violations.  ROA.2710, 2721, 2746, 2749. Nor is there any dispute that Hankins never resisted any interaction with Wheeler and Pierre or otherwise attempted to evade them.  Indeed, as observed by Hankins's expert Dan Busken, who has 35 years of law enforcement experience, "[t]here was no crime reported and there was no data in the record to indicate that Hurstville is overrun by car thieves and car burglaries."  ROA.2831.  To the contrary, "[t]he enforcement action initiated by the Officers began with a 'hunch' rather than an articulable belief an actual crime was in progress."  ROA.2831.[13]

The district court nonetheless suggested that "the driver's failure

---

[13] The district court provided no explanation for its failure to address Busken's report, although it was unrebutted.  That is likely because defendants do not bear the burden of establishing their immunity defense; if the doctrine has no basis in Section 1983, as discussed *supra* § I.C, Defendants' failure to rebut this report amounts to a concession that Busken's evaluation of the events that transpired is proper.

to immediately stop the vehicle when Officer Pierre activated his blue light" justified the officers' use of their firearms. ROA.3663. That was error: a reasonable jury could easily conclude that continuing to drive slowly after telling an officer that one is looking for a dog—particularly when the officer has merely flashed his lights, without any sirens or verbal instructions—is not any form of active resistance. Indeed, this Court has repeatedly held that similar actions do not constitute active resistance (even when officers' force varies). *See, e.g.*, *Ramirez v. Martinez*, 716 F.3d 369, 372 (5th Cir. 2013) (holding that plaintiff's failure to comply with orders to put his hands behind his back and his "pulling his arm out of [the officer's] grasp" were "insufficient to find an immediate threat to the safety of the officers"); *Newman v. Guedry*, 703 F.3d 757, 759, 763 (5th Cir. 2012) (holding that a passenger's failure to follow officers' instructions to stay in a car after stepping outside was not "active resistance"); *cf. Flores v. City of Palacios*, 381 F.3d 391, 402 (5th Cir. 2004) (affirming denial of summary judgment to officer for firing gun where plaintiff "did not respond to [the officer's] repeated commands that she stop and instead drove away"). And even if the driver's continued driving were considered noncompliance, a reasonable jury could find it

did not justify unholstering firearms—a reasonable officer could, for example, simply flash lights again, use sirens, or use the loudspeaker, and no force was needed. *See Joseph*, 981 F.3d at 332 ("While a suspect's refusal to comply with instructions may indicate that physical force is justified, officers must also select the appropriate degree of force." (quotations omitted)).

Despite his understandable shock at being pulled over by the same officer whom he had just asked for help, Hankins and his friends stopped promptly when Wheeler flashed his car lights and then used his loudspeaker. ROA.2676. In addition, as observed by Busken, "[t]here was no indication in the record that either officer suspected or questioned the occupants about an attempt to flee prior to the stop." ROA.2831. Immediately drawing their weapons on Hankins and his friends was thus an extreme escalation of force that was completely unwarranted and objectively unreasonable given the circumstances. *See, e.g.*, *Stamps v. Town of Framingham*, 813 F.3d 27, 42 (1st Cir. 2016) (denying qualified immunity and holding that "pointing a firearm at a person in a manner that creates a risk of harm incommensurate with any police necessity can amount to a Fourth Amendment violation"); *Baird v. Renbarger*, 576 F.3d

340, 346 (7th Cir. 2009) (denying qualified immunity to officers accused of "pointing a gun at a compliant adult in a non-threatening situation").

### 3. The District Court Erred by Referencing "Previous Crime in the Area" as a Basis for the Officers' Use of Force

The district court believed that "the type of previous crime in the area" justified the officers' use of their firearms when they stopped Hankins and his friends.  ROA.3663.  But the mere fact that an area has experienced high crime in the past does not mean that officers have carte blanche to point their weapons at passersby or otherwise use force on individuals in the vicinity.  Here, as noted *supra* § II.B.3, although the officers pointed to a general history of crime in the area and speculated after the fact that the youths might have been planning a burglary, they were not aware of any such criminal activity on the night they stopped Hankins and his friends.  For that reason, any "previous crime in the area" did not justify the officers' use of force on the night in question, and triable issues of fact remain regarding whether the officers' use of force was reasonable.  ROA.3663.

### 4. The District Court Ignored Hankins's Compliance with the Officers' Demands Following the Illegal Traffic Stop

As noted, the record is undisputed that, after the officers conducted

their illegal stop, Hankins and his friends continued to engage with the officers, without ever attempting to evade them.  As Busken explained, "excessive force begins when there is no resistance or when any threat to the officer has ended."  ROA.2828.  Under these circumstances, Busken opined that Wheeler's and Pierre's brandishing guns was "unnecessary, reckless, and contrary to generally accepted police practices."  ROA.2830.  Had the district court examined these circumstances, it would have been clear that Wheeler's and Pierre's use of force was excessive and objectively unreasonable.

*     *     *

Simply put, with all evidence viewed in Hankins's favor, a reasonable jury could conclude that Wheeler and Pierre lacked an objectively reasonable basis to brandish their guns at Hankins and his friends—a compliant group who themselves had asked Wheeler for help—in the context of a stop that was itself unlawful.

## C.  The Officers' Use of Excessive Force Violated Clearly Established Law

Because the district court erroneously determined that there was no violation of Hankins's rights, it again did not analyze whether Wheeler's and Pierre's use of force "violated clearly established statutory

or constitutional rights of which a reasonable person would have known." *Sam*, 887 F.3d at 713 (citation omitted); *see Taylor*, 592 U.S. at 9 n.2 (reversing grant of qualified immunity where Fifth Circuit erroneously cited "ambiguity in the caselaw" in concluding that right was not clearly established); *see also McCoy v. Alamu*, 141 S. Ct. 1364 (2021) (vacating judgment of Fifth Circuit and remanding for further consideration in light of *Taylor*). Had the district court conducted this analysis, the result would have been clear: clearly established law did not permit the officers' use of force in this case.

The law is and has long been clear that where "all *Graham* factors counsel against the use of force, it is objectively unreasonable for a police officer to brandish a deadly weapon at . . . compliant suspects." *Flores v. Rivas*, 2020 WL 563799, at *7–9 (W.D. Tex. Jan. 31, 2020). In *Flores*, for instance, the court recognized that clearly established law prohibited the use of force by an officer who "allegedly brandished his weapon at a group of compliant children, despite the absence of any fact or circumstance which would lead a reasonable person to believe that [p]laintiffs committed or were committing any offense, whatsoever." *Id.* at *7 (cleaned up). Other courts in the Fifth Circuit have routinely upheld this

principle. *See Manis v. Cohen*, 2001 WL 1524434, at *7–8 (N.D. Tex. Nov. 28, 2001) (denying qualified immunity on unlawful seizure and excessive force claims as to officer who brandished a gun at plaintiff lacking "legal justification in using any force whatsoever," including because plaintiff was "not resist[ing] lawful police authority"); *Miller v. Salvaggio*, 2021 WL 3474006, at *9–10 (W.D. Tex. Aug. 6, 2021) (finding it "objectively unreasonable for [d]efendants to point their guns at [p]laintiffs," where all "*Graham* factors counsel against the use of force").[14]

The same clearly established law that precluded qualified immunity in these cases—which arose from incidents years or even decades before the events at issue here—prohibited the force Wheeler and Pierre used here.  No facts would lead a reasonable person to believe that Hankins—who had just requested Wheeler's help finding a lost

---

[14] The district court purported to distinguish *Flores* and *Manis*, but it had no basis for doing so.  ROA.3664–65.  The district court stated that *Flores*, which involved a police officer pointing his gun at children during a birthday party, was "very different," ROA.3664, but ignored that, as in *Flores*, Hankins and his friends were youths—one of Hankins's friends was just a 12-year-old child, ROA.2668–69, 2671–72.  The district court attempted to cabin *Manis* to its facts, ROA.3664, which involved an officer who "aimed the gun at Plaintiff's head," but that force was directed at an adult who was resisting repossession of a vehicle—if anything, drawing a gun on a youth who sought an officer's help and then complied with his demands is even more unreasonable.

dog—was committing a crime, and Wheeler even described Hankins and his friends as "kids," ROA.2857–58. In 2020, reasonable officers knew that brandishing a firearm at Hankins under these circumstances was unlawful.

## IV. The District Court's Dismissal of Hankins's Constitutional Conspiracy, Supervisory Liability, and *Monell* Claims Must Be Reversed

Because the district court found that there was no underlying constitutional violation, it dismissed Hankins's remaining federal claims for conspiracy under Section 1983, supervisory liability, and *Monell* violations for policies, patterns, or practices that result in constitutional violations. ROA.3665–66. The district court did not otherwise analyze whether Defendants are entitled to summary judgment with respect to these claims.

As set forth above, Defendants were not entitled to summary judgment on Hankins's Fourth Amendment claims. Accordingly, this Court should reverse the district court's grant of summary judgment as to the conspiracy, supervisory liability, and *Monell* claims. *See Thomas v. Pohlmann*, 681 F. App'x 401, 408 (5th Cir. 2017) (reversing grant of summary judgment on *Monell* claim where district court dismissed claim

based on a finding that there was no underlying constitutional violation, where such finding was reversed).

## V. The District Court's Refusal to Exercise Supplemental Jurisdiction Over Hankins's State Law Claims Warrants Reversal

The district court declined to exercise supplemental jurisdiction over Hankins's remaining state law claims on the grounds that no federal claims remained in the case. ROA.3666. But as discussed above, that threshold ruling is incorrect. *See supra* §§ II–IV. Because the district court's dismissal of Hankins's Section 1983 claims should be reversed, so too should the dismissal of his Louisiana state law claims.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the district court.

Dated: December 27, 2023

/s/ *Patrick J. Hayden*
PATRICK J. HAYDEN
VICTORIA R. PASCULLI
COOLEY LLP
55 Hudson Yards
New York, NY 10001
(212) 479-6000
phayden@cooley.com
vpasculli@cooley.com

PATRICK E. GIBBS
COOLEY LLP

3175 Hanover Street
Palo Alto, CA 94304
(605) 843-5000
pgibbs@cooley.com

NORA AHMED
BRIDGET WHEELER
ACLU FOUNDATION OF LOUISIANA
1340 Poydras Street, Suite 2160
New Orleans, LA 70112
(504) 522-0628
nahmed@laaclu.org
bwheeler@laaclu.org

*Counsel for Plaintiff-Appellant
Bilal Hankins*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 27, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the CM/ECF system. I certify that service will be made on opposing counsel.

*/s/ Patrick J. Hayden*
Patrick J. Hayden

## **CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 12,707 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14-point font.

*/s/ Patrick J. Hayden*
Patrick J. Hayden

# APPENDIX A

# Excerpt of the Civil Rights Act of 1871

Certified by the National Archives and Records Administration
August 19, 2022 (highlighting added)

